## L. BUCKI & SON LUMBER CO. v. ATLANTIC LUMBER CO. et al.

(Circuit Court of Appeals, Fifth Circuit.  March 10, 1903.)

### No. 1,143.

1. WRONGFUL ATTACHMENT—MALICE—WANT OF PROBABLE CAUSE—SUBMISSION OF QUESTIONS TO JURY—SUFFICIENCY OF EVIDENCE.
   Evidence in an action for damages for wrongfully and maliciously suing out writs of attachment examined, and *held* to require the submission to the jury of the issues as to the want of probable cause and the existence of malice.

2. SAME.
   While the issue of probable cause in an action for wrongfully and maliciously suing out an attachment is, as a general rule, for the court, yet where it depends on disputed facts and conflicting evidence as to defendant's good faith and just belief, it is for the jury.

3. SAME.
   In an action for wrongfully and maliciously suing out an attachment, the issue of malice per se is for the jury.

4. SAME—ADVICE OF COUNSEL.
   Where an action for wrongfully and maliciously suing out an attachment is defended on the ground that the advice of counsel was sought and followed, the fact that the counsel was a director and secretary of the defendant, renders the issue of malice peculiarly for the jury.

5. SAME—MOTION FOR DIRECTED VERDICT.
   In an action for wrongfully and maliciously suing out writs of attachment, a motion for a directed verdict for defendant on the ground that "it appears from the evidence herein" that the defendant had probable cause, and that "it appears from the overwhelming weight of the testimony" that the defendant had no malice, is improperly granted, such matters being for the jury.

6. SAME—AMENDMENT OF PLEADINGS—DISCRETION.
   In an action for wrongfully and maliciously suing out an attachment, the refusal to permit plaintiff to file an additional count averring the wrongful and malicious prosecution of the common-law suit in which the writ issued, the amendment being asked to eliminate embarrassment which might arise upon defendant's contention that the damages suffered were not solely the result of the attachment, is not an abuse of discretion.

7. SAME—PRODUCTION OF BOOKS—RELEVANCY OF EVIDENCE.
   Rev. St. § 724 [U. S. Comp. St. 1901, p. 583], provides that in the trial of actions at law the federal courts may require the parties to produce

books or writings containing evidence pertinent to the issue in cases and under circumstances where it might be done by the ordinary rules of chancery. *Held,* that a motion by defendant, in an action for wrongfully and maliciously suing out an attachment, to require plaintiff to produce its books so as to show its insolvency, inability to meet accrued obligations, and failure to make profits was improperly granted, neither plaintiff's insolvency nor inability to meet accrued obligations being a defense.

8. SAME—DISPOSITION OF ATTACHED PROPERTY—RELEVANCY OF EVIDENCE.
   In an action for wrongfully and maliciously suing out an attachment, evidence tending to show what disposition was made of the attached property after its release and bonding is irrelevant, and improperly admitted.

9. SAME—VALUE OF PROPERTY.
   In an action for wrongfully and maliciously suing out an attachment on the property of a sawmill company, evidence of a witness as to how much he paid for the mill four years after the attachment is irrelevant, and improperly admitted.

10. SAME—SOLVENCY OF PLAINTIFF—NONEXPERT WITNESS.
    In an action for wrongfully and maliciously suing out an attachment, an objection to a question propounded by defendant to a nonexpert witness as to what, supposing there had been no attachment, and the plaintiff had been unable to procure a certain loan, would have been its ability to continue payment of its obligations, including sums due defendant, is improperly overruled.

11. SAME—MALICE—PROBABLE CAUSE—SUBSEQUENT EVENTS.
    In an action for wrongfully and maliciously suing out an attachment, evidence as to matters occurring after the issuing of the attachment is inadmissible to establish probable cause or show absence of malice.

12. SAME—PARTY'S OWN EVIDENCE.
    In an action for wrongfully and maliciously suing out an attachment, the testimony of defendants that they were not actuated by malice is properly admitted in conformity to the Florida rule admitting such evidence under a statute authorizing a party to a civil action to testify in his own behalf.

13. SAME—INSTRUCTIONS IN ORIGINAL CASE.
    In an action for wrongfully and maliciously suing out an attachment, instructions given by the court in the original action, expressive of its opinion as to certain facts proved in that case, are properly excluded as irrelevant.

In Error to the Circuit Court of the United States for the Southern District of Florida.

This is an action for damages for maliciously suing out two writs of attachment and the levying and maintaining the levy of such writs upon the properties of the plaintiff in error. The declaration consists of two counts. The first count charges the defendants with maliciously and without probable cause suing out a writ of attachment for $9,980.80, and maliciously endeavoring to maintain the same. The second count charges the defendants with maliciously and without probable cause suing out, levying, and maintaining the levy of another writ of attachment for $75,000. Both writs were issued and levied on the 1st day of October, A. D. 1897, at half past 6 o'clock p. m., and both were auxiliary attachments to common-law suits by the ordinary process of summons, which were served upon an officer and agent of the plaintiff residing in the city of Jacksonville, in the said county, where the business of the plaintiff in error was conducted. The suits were removed to the court below from the state court.

The plaintiff was a corporation organized under the laws of the state of New Jersey, and the Atlantic Lumber Company was a corporation organized under the laws of the state of Florida. Daniel G. Ambler was the president

¶ 12. See Malicious Prosecution, vol. 33, Cent. Dig. § 140.

and a director; Arthur Meigs was the general manager and a director, and Richard H. Liggett was the secretary and a director of the Atlantic Lumber Company at the time the attachments were issued, and had been such officers for several years prior to such attachments. All of the defendants were citizens of the state of Florida. All the pleas went out on demurrer, except the pleas of not guilty, and the case went to trial on such issues of fact as were raised by pleas of not guilty.

In the summer of 1892, the plaintiff and defendant company became bound to each other by mutual covenants in a contract as follows: The plaintiff to build a sawmill with a daily capacity of 100,000 feet per day, with a boom pen of the capacity of 2,000,000 feet; defendant company to deliver into said pen 2,000,000 feet of good merchantable green pine logs each month for eight years from the starting of such mill, at specified prices. The size of the logs were to be such that the average each month should be 3½ logs per 1,000 feet, board measure, which said size the defendant guarantied. Payments were to be made on the 1st and 15th of each month for the deliveries made during the preceding two weeks. Other provisions and details of the contract will be found recited in other cases in this court between these same parties growing out of this same contract, and particularly in Bucki & Son Lumber Co. v. Atlantic Lumber Co., 109 Fed. 411, 48 C. C. A. 455, wherein we held as to this same contract as follows: "The contract contained stipulations and guaranties in regard to which there might be failures and breaches frequently occurring during the life of the contract—such as the failure to pay in time as agreed, and the failure to maintain the warranty as to the average of the logs delivered monthly—none of which would necessarily put an end to the contract, even if suit should be instituted for such breach. Notwithstanding the subsidiary provisions, breaches of which might warrant a suit, the contract appears to be an entirety, and not several independent agreements." See Atlantic Lumber Co. v. Bucki & Son Lumber Co., 63 U. S. App. 382, 35 C. C. A. 59, 92 Fed. 864; Id., 63 U. S. App. 384, 35 C. C. A. 59, 92 Fed. 864; Atlantic Lumber Co. v. L. Bucki & Son Lumber Co., 35 C. C. A. 59, 92 Fed. 864; L. Bucki & Son Lumber Co. v. Atlantic Lumber Co., 35 C. C. A. 590, 93 Fed. 765; Bucki & Son Lumber Co. v. Atlantic Lumber Co., 47 C. C. A. 685, 109 Fed. 1061; L. Bucki & Son Lumber Co. v. Fidelity & Deposit Co. of Md., 48 C. C. A. 436, 109 Fed. 393; L. Bucki & Son Lumber Co. v. Atlantic Lumber Co., 48 C. C. A. 455, 109 Fed. 411; L. Bucki & Son Lumber Co. v. Atlantic Lumber Co., 53 C. C. A. 513. 116 Fed. 1.

The plaintiff in error contends, and it must be admitted that he introduced evidence tending to show, as follows:

Plaintiff built the mill and boom pen, according to covenant, at an expense of nearly $150,000, and commenced sawing about the 1st of April, 1893, when the defendant commenced to make deliveries. As soon as the mill had started up, plaintiff had performed all the covenants in the contract except to pay for the logs thereafter delivered. Defendant company continued to make deliveries of logs—that is, logs with green merchantable sap, which by contract should not exceed four inches—up to about May, 1897. In the latter part of September, 1896, a destructive cyclone swept over the state of Florida from the mouth of the Suwanee river to the Georgia line, felling or destroying the pine forests over an area of land 40 miles wide and 120 miles long. In such area defendant company, prior to the storm, had bought timber lands or stumpage, upon which it relied to supply the logs called for by the contract. This area of virgin timber was southwesterly from the town of Starke, Alachua county. Into this area, from said town, the defendant company (not owning any franchise to build and operate a railroad) built a railroad, long prior to the storm, under the charter of another railroad corporation, connecting at Starke with the railroad owned by the F. C. & P. Railroad Co., and extending to plaintiff's mill, which was in the city of Jacksonville, Duval county. Prior to defendant company's building such road a distance of thirty miles, at a cost, with equipment, of about $230,000, it had obtained from the said the F. C. & P. Railroad Co. a contract for freight rates for its logs to Jacksonville from any point on the line of defendant company's main line of railroad aforesaid. Defendant company's capital stock was only $100,000 par value, but by borrowing money it built said railroad, and became

the owner of all the stock of said chartered railroad company, except about $4,000. This new road was bonded at $8,000 per mile, and defendant company owned all the bonds, which it hypothecated to raise money on to build said road. At the time of the said storm defendants' logging camp equipment, consisting of about 150 mules, tackle, etc., and log carts, costing about $30,000, and iron rails for spur tracks for logging purposes only, costing about $12,000, were located and were operating in such storm area, at or near the western end of its main railroad, some 30 miles from Starke. All this large outlay of money was necessary to enable defendant to obtain logs of required size to fill the contract—at least defendant thought so—and thereby the defendant company had expended all its capital of $100,000 and approximately $172,000 more. Soon after the storm the defendants were confronted with financial ruin. Why?

(1) Because the storm destroyed timber within 100 miles of Jacksonville running up into billions of feet, according to an estimate made by Ambler, defendant company's president, which estimate he caused to be published. There were in Jacksonville and vicinity five or six other sawmills to be supplied with logs. Necessarily, defendants foresaw that, resulting from such enormous destruction of timber, they would not only lose a large portion of their capital invested in timber and timber lands within the storm area, but the supply of standing timber which they did not own, within such a distance from Jacksonville as to render it possible to be delivered into plaintiff's boom at the contract price, would be largely diminished, and the price of standing timber largely increased. And this apprehension or foresight is abundantly verified by the evidence in this case.

(2) They foresaw that they would soon have to cease cutting storm timber, because it would soon be ruined by worms, and, unless they could find timber at a profitable distance from their main line of road, and had capital to buy it with to fill the contract, a very large portion of their capital invested in such railroad would be lost. For it was a fact, then well known to defendants, and now conceded by defendants' own testimony, that the business over their road from Starke, apart from hauling their own logs, would hardly pay operating expenses, and that, consequently, if they should move their logging plant to some other part of the state, said railroad would be utterly worthless, save the value of the iron rails, partially worn out, if perchance legislative authority to remove them could be obtained.

(3) With this calamity staring it in the face, defendant, by its general manager, Meigs, applied, by letter dated February 23, 1897, to the plaintiff, to modify such contract so as to enable defendants to put into its boom pens, from the storm area, all the logs they could, as fast as they could, in order to save as much of this timber as possible in the storm region by getting it into water before it was destroyed by worms. Defendants also requested that plaintiff should pay for all excess above the 2,000,000 feet limited by the contract at contract prices; and this request was put on the ground that defendant company was financially unable to put such excess into the boom unless it received pay for it as the logs were delivered. Defendant company, in this letter, urged plaintiff to so modify the contract on the ground unequivocally admitted in the said letter that there was no doubt defendants would at an early date be short of a supply of logs to fill the contract. Plaintiff yielded to such requests on being so importuned, and the payments and advances made by it to defendants to aid in saving them from ruin were such that defendant company, at the end of each month from February 1st to September 1st, on account of such excess, including some advances prior to said letter, owed the plaintiff large sums of money.

(4) Still later—about the 1st of May—the worms had honeycombed the sap of the logs, and rendered them unmerchantable, and defendant company requested, as a further favor, that plaintiff would accept such storm logs on a survey excluding the sap, the average of the logs not to be diminished, and only the heart of the logs to be paid for; and this was agreed to, providing such storm logs were not to be delivered after the worm had penetrated the heart. As the contract called for merchantable logs, and it was then and is now conceded by defendants that a log was not, under such contract, merchantable, unless its diameter at the small end was twelve inches, and it

being conceded by defendants and established by evidence that the sap on the logs delivered for the four months next prior to October 1st averaged 3.65 inches, defendants could not cut and deliver a log which, including the sap, measured at the small end less than 16 inches. Half inches are not counted. See Preston's Rules of Survey. The result necessarily was that defendants had to abandon, as lost, all storm logs under 16 inches at the small end, and could cut no tree or stick that was not 16 inches and upwards at the small end, excluding sap. This was a great financial loss to defendants.

(5) But it cost as much to cut, load and unload, survey and transport the storm log as the green log, and, as defendants only got pay for the heart of the storm logs, they lost on delivering such logs, by excluding sap, nearly one-half of the cost of the log in the boom, and they had to deliver above 2,000,000 feet including sap to get pay for 1,000,000 feet excluding sap. Defendants struggled along during June, July, August, and September, 1897, under great and distracting financial distress, and delivered such storm logs during said months at a monthly loss of at least $5,000 per month, because they could not deliver logs according to contract. In each of said months the logs averaged about 4 logs per thousand, and were short in quantity about 250,000 each month, and many of them less than 12 inches in diameter, and therefore not merchantable, and in many of them the worms had penetrated the heart. Defendant company finally had to abandon cutting such storm logs after it ceased deliveries to plaintiff, because it was unprofitable.

(6) As a further act of kind treatment by plaintiff, it had overpaid the defendant company the full contract price for all such inferior logs delivered up to September 15th by $250, and on October 1st the contract price of the logs delivered after September 15th, if up to contract, was $6,841.79. This sum of $6,841.79, less a credit of $250 was, on October 1st, the only possible claim defendant company had against plaintiff, making no deductions whatever for the breach of warranty as to size or unmerchantability because of less diameter than 12 inches at the small end, or worms in the heart; and had so paid, without calling for larger logs. until September 11th, when larger logs were requested.

(7) On October 1, 1897, the defendant company was insolvent, and by such insolvency had in fact incapacitated itself to continue to perform the contract, and defendants admit in the witness box that their company was indebted on the day aforesaid in the sum of about $140,000; that much of it was overdue; its paper at its bank went to protest on that day; it was unable to meet its pay roll, overdue, and unable to pay freight on logs, overdue; and defendants admit, as such witnesses in their own behalf and otherwise, that the defendant company did not, on October 1st, own logs available to comply with the contract, and unable to buy others that would comply with the contract.

The foregoing statement contains the ultimate facts as stated. which are either admitted by the defendants themselves, or established by the evidence beyond dispute. The following facts are also conceded, or indisputable on the evidence:

(8) Over three weeks prior to October 1st, defendant Liggett, on instructions by Meigs, his company's general manager, prepared two affidavits for attachments—one for $75,000, the amount of the other was left blank—and left said affidavits with his clerk in his law office, to be used in his (Liggett's) absence, if he, the said clerk, was instructed by the officers of the company to use them. Liggett then went to Virginia, Meigs went to New York, and Ambler had been in New York for four months (prior to October 1st), and neither of said officers returned to Florida until after the writs were issued.

(9) Plaintiff, on the evening of September 30th, had consummated with a Boston lumber dealer financial arrangements by selling lumber already on hand in its yards and on its docks, by which said dealer bought said lumber for the sum of $25,000, which plaintiff expected to receive on October 2c. and which defendants knew plaintiff had the best of reasons to believe it would receive in a day or two. And plaintiff had assured the defendants that, as soon as said moneys were received from the Boston Company, it, the plaintiff, would advance to defendants not less than $12,000 on account of log deliveries, and to that extent relieve them of financial distress.

(10) Well knowing such facts, and also well knowing that, relying upon having said $25,000 from the Boston Company, the plaintiff had not made any other financial arrangements for cash for use in its business; and, well knowing that plaintiff had, within two weeks prior to October 1st, paid defendant company nearly $10,000 on log account; and well knowing for the above reasons that on the 1st day of October plaintiff did not have any cash on hand—the defendants Ambler and Meigs went into plaintiff's New York office, at No. 29 Broadway, and requested a payment of $2,500 on log account, to meet their paper due at their bank on that day, to prevent it going to protest. And because Ambler and Meigs did not get the $2,500, they, in a state of mental excitement over their own company's financial condition, and without calling for a settlement or making any effort to come to an agreement as to what their just claim for logs was; without any attempt on their own part to examine their own books, which they had not seen for three weeks, to ascertain what their just claim was; without even intimating in any way that they were going to sue out attachments; and without consulting counsel as to their claim or right to an attachment—they (Ambler and Meigs) made a rush from plaintiff's office to the nearest telegraph office in New York City, and before 2 o'clock p. m. wired one Elmore, a clerk, of 24 years, to immediately sue out attachments for the balance claimed on log account, of $9,-980.80, and for $75,000 for so much profit they assumed they could make in the next three years and a half. Elmore, under such instructions, filled up the blank in the one affidavit, inserting $9,980.80, and swore to that, and the other for $75,000, caused them to be filed with the clerk of the court, and the bonds required by statute. The clerk issued the writs of attachment, and by about 6 o'clock p. m. of said October 1st those writs were levied on all the plaintiff's mill plants, on over 5,000,000 feet of manufactured lumber, and on over 3,000,000 feet of logs in the boom. These writs were auxiliary to two common-law actions commenced by præcipe and summons on the same day, which summons was served on an officer of plaintiff company. The defendant, plaintiff in said action, on the motion of plaintiff in each case, pursuant to statute, was ordered by the court to file a declaration specifying the claims on which the attachments were based, and such declaration in the case, for balance on log deliveries, only claimed $8,609.78, without giving credit for $2,000 defendant company had been paid, which $2,000 was credited in making up the sum of $9,980.80, stated in the said affidavit for the writ. Crediting this $2,000, the utmost possible claim for logs was $6,609.78. This smaller attachment for $9,980.80 was dissolved on motion, based on the attachment papers and said declaration, showing no such sum was due on October 1st for log deliveries, for which an attachment could issue.

The declaration in the action in which the writ for $75,000 was had specified two separate and independent grounds. One was for such expected profits; the other was on a claim discovered after the writs of attachment were issued by getting possession of plaintiff's books at its mill, to wit, that the cut or product of the timber and lumber from the logs was many millions of feet in excess of the survey according to Preston's rules; and that defendants claimed the right to be paid for such excess at the contract price, although they knew Preston's rules were based on board measure; and by cutting large timber the lumber thus saved from the same kerf would make a large excess over such survey. To make such claim defendants had to charge their own surveyor with making fraudulent surveys. On an issue of fact denying indebtedness, the writ for $75,000 was dissolved, because no such indebtedness was found to exist, and on the trial of the action on the merits on claims for profit and overcut, defendant (plaintiff here) recovered.

By writs of error, petitions for a rehearing in this court, and application for a writ of certiorari defendants were able to maintain the lien of these attachments for nearly two years; and, as usual in such cases, the plaintiff's business was ruined and destroyed in consequence of such writs.

After issuing these writs, Ambler, Meigs, and Liggett returned to Florida, and (a) sued out, on October 4th, two other attachments for about $2,000 each, repeating therein the charges of fraud, and then wired the Boston Company that they have attached for $90,000 to prevent plaintiff from getting the $25,-000; and, (b) learning that the sheriff is about to allow plaintiff to saw up

the logs in the boom under an arrangement whereby the lien of the attachment would rest on the manufactured product of the logs, which would increase defendants' security, the lumber being more valuable than the logs, the defendants interfere, and apply to the sheriff, urge him to grant no favors to plaintiff, because they want to coerce it to settle their demands, and that the sheriff ought to stand by home people as against foreigners.

The defendants in the court below, to show probable cause for the issuance of the attachments, and the nonexistence of malice therein, offered evidence showing that prior to and at the time of the suing out of the writs they took the advice of the counsel of the Atlantic Lumber Company, who was also a director and secretary of the same, and also the advice of other counsel in a partial way, and the said defendants here rely in addition for justification upon the following matters, which there was evidence tending to establish, to wit:

The defendant made all essential preparations for the performance of the contract. It purchased large quantities of timber land and stumpage privileges. It provided itself with a logging outfit, having a capacity of $2\frac{1}{2}$ million feet per month. It built a permanent railroad from the Florida Central & Peninsular Railway into the timber region. It made a 20-year traffic contract with the F. C. & P. to haul its log trains from Starke (the junctional point with defendant's railroad) to the plaintiff's mill at the uniform price of $4 per car. It provided itself with a powerful locomotive and 50 log cars, each having a capacity of over 4,000 feet. The performance of the contract was commenced and continued without serious difficulty until June, 1897. The contracts provided that during the first year payments for logs should be made by 60-day drafts, payable in the city of New York, but that after one year from the date of the contract the defendant might demand cash. Upon the expiration of the first year the defendant did demand cash, but continued to take plaintiff's paper in settlement for logs. All of this paper was handled by the National Bank of Jacksonville, the time of payment in each instance being made to suit the pleasure of the bank. On June 5, 1897, one of the plaintiff's log drafts went to protest. This immediately caused distrust at the bank. During the month of June plaintiff's boom pen became so crowded with logs that the defendant was unable to put more logs into the pen, and in consequence the defendant was compelled to shut down its log camp for a period of about ten days. By allowing its log pen to become crowded, plaintiff disabled itself from accepting and receiving two million feet of logs per month, and this in itself was a breach of the contract. Nevertheless, the defendant, for the purpose of assisting the plaintiff, voluntarily, and at great loss to itself, shut down its camps as stated. During July and August the plaintiff's log drafts went to protest at frequent intervals, and when the log settlement of August 15, 1897, became due, the plaintiff was wholly unable to pay cash, and the bank refused to discount its draft, because at that time some of the log drafts were past due, unpaid, and had been protested. Afterwards, on August 19th, upon the statement of the plaintiff that all of the protested log drafts had been taken up (a statement which subsequently proved untrue), the bank consented to discount the plaintiff's ten-day draft for $5,340.75, dated August 16, 1897, given the defendant in settlement for the deliveries made prior to August 15, 1897. On August 23, 1897, the defendant notified the plaintiff in writing that, owing to the refusal of the bank to discount the plaintiff's paper, the defendant would in future have to require the plaintiff to pay cash. The draft for $5,340.75 fell due August 26th, and was not paid, and was duly protested. This draft was not paid until some time in the following year. On September 1, 1897, $6,024.98 became due to the defendant from the plaintiff for logs delivered between August 14, 1897, and that date. Payment of this amount was demanded, but the plaintiff was unable to pay any part of the same. On September 15, 1897, the further sum of $5,704.56 became due for logs delivered between August 31, 1897, and that date. Payment of the same was demanded, but the plaintiff was able to pay only the sum of $2,500 on account thereof. Afterward, on September 18th, 20th, and 27th, the plaintiff paid the defendant the sums of $2,000, $3,961.65, and $1,500, respectively. These sums being applied to the balance due for logs delivered between

August 14 and September 15, 1897, left due from the plaintiff to the defendant the sum of $1,767.99 on account of those logs. On October 1, 1897, the plaintiff became indebted to the defendant in the further sum of $6,841.79 on account of logs delivered between September 15, 1897, and October 1, 1897. The result of all this was that on October 1, 1897, the plaintiff owed the following amounts on account of logs: (1) The protested draft for $5,340.75, of which $3,340.75 was due on account of logs delivered prior to August 15, 1897. (2) The sum of $1,767.99, the same being the balance due on account of logs delivered between August 14, 1897, and September 15, 1897. (3) $6,841.79 on account of logs delivered between September 15, 1897, and October 1, 1897. The plaintiff likewise owed the defendant a little less than $1,800 on another account, which was then long overdue. During the months of June, July, August, and September, 1897, the defendant, in order to assist the plaintiff, diminished the log delivery to the plaintiff to less than two million feet per month, and sold the balance of the logs to other parties for a much less sum than the contract price. Thus in July, August, and September the defendant sold 211,985 feet, 623,511 feet, 410,364 feet, and 385,638 feet, respectively, to Hunter and Cashen, and also 678,195 to Clerk, during these four months. On September 11, 1897, Arthur Meigs, general manager of the defendant, wrote the plaintiff as follows: "I beg to advise you that in future we shall be obliged to deliver you the entire output of our camps, which will be about 2,500,000 per month, until we have made up the average to you of two million feet per month. We are now something over 1,000,000 feet behind this average. I hope you will be able to receive the logs, and pay for them according to the contract,' and that we shall not be obliged to shut down our camps, in which event we shall, of course, hold you for the expenses incurred in so doing." On receipt of this letter Charles L. Bucki, president of the plaintiff, informed D. G. Ambler, president of the defendant company, that the plaintiff would not permit the defendant to make up the deficiency in delivery. The draft for $5,340.75, above referred to, embraced a balance of $3,340.75 due on account of logs delivered prior to August 15, 1897, and the sum of $2,000, which was styled "an advance" on logs to be delivered. The history of this so-called advance was as follows: About September, 1894, the plaintiff owed the defendant about $1,400 on account of certain matters growing out of the logging camps, and the defendant's general manager at that time applied to the president of the plaintiff to make payment of same, and was informed by the president that he was unable to pay the same unless authorized by the board of directors, but that he would make the defendant an advance, and the plaintiff consequently added the sum of $3,000 to its next log draft as an advance to the defendant, and when this draft became due the defendant paid the said $3,000 and the interest thereon, and in the draft taken in the next settlement the same sum of $3,000 was added as an advance. This operation was kept up until August 15, 1897, the defendant in each case paying the interest, and the process amounting to not more than the plaintiff's making its paper for $3,000 more than was due on the log account, the defendant taking care of the paper to that extent, and paying the interest on the said so-called advance. When the settlement of August 15th came, a sufficient part of the amount then due for logs was applied to this so-called advance to liquidate it, and when the new draft was taken an advance of $2,000 was included therein, instead of $3,000, making the draft $5,340.75. On October 1, 1897, the Atlantic Lumber Company brought two common-law actions against the Bucki Company—one for $15,000, in which an ancillary writ of attachment for $9,980.80 was contemporaneously sued out; and another action for $90,000, in which an ancillary writ of attachment for $75,000 was contemporaneously sued out. On November 1, 1897, the court dissolved the smaller attachment for $9,980.80 upon motion, and from this order no supersedeas was sued out. The attachment for $75,000 was dissolved February 14, 1898, upon pleas involving the merits. Meanwhile the two actions had been consolidated, and on May 7, 1898, the Atlantic Lumber Company recovered a verdict for $8,988.37, upon which judgment was duly entered. Some of the defendants were permitted to testify substantially that they believed there was probable cause; that they acted in good faith, and were not actuated by malice. And there was

much other evidence, bearing, some of it, directly, some indirectly, and much of it—not all—on the issues of the case.

After the close of the evidence, the defendants presented a motion as follows:

"Now come the defendants, the Atlantic Lumber Company, D. G. Ambler, Arthur Meigs, and R. H. Liggett, by their attorneys, and jointly and severally move the court to instruct the jury to find the defendants not guilty on the first count of the declaration, on the following grounds:

"(1) Because the plaintiff has failed to prove want of probable cause for suing out the writ of attachment for $9,980.80.

"(2) Because the plaintiff has failed to prove that said writ of attachment for $9,980.80 was sued out maliciously.

"(3) Because it appears that there was probable cause for suing out the writ of attachment for $9,980.80.

"(4) Because it appears from the undisputed evidence that at the time of the suing out of said writ of attachment the defendants believed, and had reasonable grounds for believing, that the plaintiff was indebted to them in the sum of $9,980.80.

"(5) Because the circumstances under which said writ of attachment was sued out exclude the idea that the said writ of attachment was sued out maliciously, it appearing from the evidence that the Atlantic Lumber Company was advised by counsel learned in the law that they had a right to include in the amount of their attachment the draft of $5,340.75 held by the National Bank of Jacksonville, and that said draft was taken upon the express agreement that it should not be in settlement of the indebtedness of the L. Bucki & Son Lumber Company to the Atlantic Lumber Company unless paid, and it further appearing from the evidence that within six hours from the suing out of said writ of attachment the Atlantic Lumber Company would have had a legal right to sue out a writ of attachment against the plaintiff for the sum of $9,980.80, excluding the amount of said draft, and it appearing likewise that this writ of attachment was sued out after dark, on October 1, 1897, and after all prospect of payment had ceased.

"(6) Because it appears from the undisputed evidence that the defendants D. G. Ambler and Arthur Meigs were acting as officers of the Atlantic Lumber Company, in their official capacity as such, and not as individuals, in suing out said writs of attachment, and there is no evidence that they instigated or procured the suing out of said writs of attachment in their individual capacities, or other than as officers of the Atlantic Lumber Company.

"(7) Because it appears from the undisputed evidence that the defendant Richard H. Liggett was acting as the attorney of the Atlantic Lumber Company in suing out said writ of attachment, and not as an officer of the Atlantic Lumber Company, nor in an individual capacity.

"(8) Because it appears from the undisputed evidence that the defendants acted on the advice of counsel in suing out said writ of attachment, and were advised that they had a right to sue out said writ of attachment for the purpose of enforcing the lien of the Atlantic Lumber Company against the property attached in the way and manner in which the Atlantic Lumber Company attempted to enforce the same.

"And now come the defendants, the Atlantic Lumber Company, D. G. Ambler, Arthur Meigs, and R. H. Liggett, by their attorneys, and jointly and severally move the court to instruct the jury to find the defendants not guilty upon the second count of the declaration, for the following reasons, and upon the following grounds:

"(1) Because the plaintiff has failed to prove that there was want of probable cause for suing out the writ of attachment against the plaintiff for the sum of $75,000.

"(2) Because the plaintiff has failed to prove malice on the part of the defendants, or either of them, against the plaintiff, in suing out said writ of attachment.

"(3) Because it appears from the evidence herein that the defendant the Atlantic Lumber Company had probable cause for suing out the writ of attachment for $75,000.

"(4) Because it appears from the overwhelming weight of the testimony in the case that the defendants, the Atlantic Lumber Company, D. G. Ambler, Arthur Meigs, and R. H. Liggett, had no malice in suing out said writ of attachment, and sued the same out in a reasonable and honest belief that the Atlantic Lumber Company had a cause of action against the plaintiff for the sum of $75,000 for which a writ of attachment might issue.

"(5) Because the following facts have been shown to exist by the overwhelming weight of the evidence:

"(a) That on October 1, 1897, the plaintiff owed the Atlantic Lumber Company, on account of logs delivered by the Atlantic Lumber Company to the plaintiff prior to that time, the payment of which was demanded and refused by the plaintiff on the said 1st day of October, 1897, and this fact is established by the judgment obtained by the Atlantic Lumber Company against the plaintiff.

"(b) The failure to pay the amount due for logs was a breach of a substantial provision of the log contract, as determined by this court and the Circuit Court of Appeals in the suit of L. Bucki & Son Lumber Company against the Atlantic Lumber Company to recover damages for breach of contract, because it appears from the undisputed evidence that the officers of the Atlantic Lumber Company, D. G. Ambler, Arthur Meigs, and R. H. Liggett, on October 1, 1897, entertained an honest and reasonable belief that the provisions of the log contract calling for an average of 3½ logs per thousand applied to logs delivered for the whole period of eight years, as shown by their consistent claim to that effect during the period of three and one-half years, during the greater part of which time the plaintiff acquiesced in that construction of the contract.

"(c) It is shown by the undisputed evidence that on October 1, 1897, the officers of the Atlantic Lumber Company, D. G. Ambler, Arthur Meigs, and R. H. Liggett entertained a reasonable and honest belief that the average of the logs theretofore delivered was better than 3½ per thousand, and that this information was based upon entries appearing in the books of the Atlantic Lumber Company, which had been made in due course of business.

"(d) It appears that the court which heard the motion to dissolve the attachment dissolved the same solely upon the ground that the general average of the logs delivered prior to October 1, 1897, was on that date 3.52 to the thousand, instead of 3.50.

"(e) It appears from the undisputed evidence that the officers of the Atlantic Lumber Company, D. G. Ambler, Arthur Meigs, and R. H. Liggett, on October 1, 1897, entertained a reasonable and honest belief that the Atlantic Lumber Company would be able to perform the unexpired portion of the log contract, and realize a profit thereon in excess of $75,000.

"(6) Because it appears from the evidence that prior to October 1, 1897, Arthur Meigs, the general manager of the company, submitted all of the material facts of which he had knowledge, or which he could obtain by diligent inquiry, to a licensed and reputable attorney at law, and was advised by said attorney that under conditions similar to those existing on October 1, 1897, the said Atlantic Lumber Company had the right to sue for the recovery of $75,000 damages, and to sue out a writ of attachment for the amount thereof against the property of the plaintiff.

"(7) Because on October 1, 1897, at the time of the suing out of said writs of attachment, the Atlantic Lumber Company and its officers, D. G. Ambler, Arthur Meigs, and R. H. Liggett, acted under an honest and reasonable belief that the L. Bucki & Son Lumber Company was indebted to the Atlantic Lumber Company in the sum of $75,000, and that the said Atlantic Lumber Company had the right to proceed to recover said indebtedness by a writ of attachment against the property of the said L. Bucki & Son Lumber Company."

After argument the court granted the motion, and thereupon directed a verdict for all of the defendants on both counts. Judgment was entered on the verdict, and the plaintiff sues out this writ.

H. Bisbee and Geo. C. Bedell, for plaintiff in error.

R. H. Liggett, for defendants in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

Having stated the case as above, the opinion of the court was delivered by PARDEE, Circuit Judge.

The foregoing statement shows a case of conflicting facts and evidence as to the want of probable cause in suing out the writs of attachment complained of and as to the actual and inferential malice of the defendants in suing out the same, which should have been submitted to a jury.

In Alsop v. Lidden, 30 South. 401, 403, the Supreme Court of Alabama defined probable cause for suing out an attachment as follows:

"Probable cause is such a state of facts and circumstances as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice, to believe that some one of the grounds for. the suing out of the writ existed. And in deciding upon the existence of probable cause the plaintiff's belief in the existence of a ground for the attachment cannot be considered, nor the existence of such facts as might have influenced his judgment; but the test is the effect they might have upon the judgment of ordinarily prudent and reasonable men. These definitions exclude all idea that mere suspicions and belief, however honestly and intensely entertained, unsupported by facts known to the plaintiff in attachment, which would have justified reasonable and cautious men in believing the defendant had been guilty of some act creating a ground of attachment, constitute probable cause. 'A party may, in extreme eagerness to collect a debt or to obtain security for it, without probable cause resort to an attachment; and the absence of probable cause, coupled with the unlawful act of suing out the writ, is a vexatious or malicious abuse of the process.' Durr v. Jackson, 59 Ala. 210. 'Malice may sometimes be inferred from the want of probable cause.' Jordan v. Railroad Co., 81 Ala. 226, 8 South. 192."

As a general rule, the question of probable cause may be for the court; yet, where it depends on disputed facts and conflicting evidence as to defendant's good faith and just belief, the question is for the jury. "It is true that what amounts to probable cause is a question of law in a very important sense. In the celebrated case of Sutton v. Johnstone the rule was thus laid down: 'The question of probable cause is a mixed question of law and of fact. Whether the circumstances alleged to show it probable are true, and existed, is a matter of fact; but whether, supposing them to be true, they amount to a probable cause, is a question of law.' This is the doctrine generally adopted. McCormick v. Sisson, 7 Cow. 715; Besson v. Southard, 10 N. Y. 236. It is, therefore, generally the duty of the court, when evidence has been given to prove or disprove the existence of probable cause, to submit to the jury its credibility, and what facts it proves, with instructions that the facts found amount to proof of probable cause or that they do not. Taylor v. Williams, 2 Barn. & Adol. 845. There may be, and there doubtless are, some seeming exceptions to this rule, growing out of the nature of the evidence—as when the question of the defendants' belief of the facts relied upon to prove want of probable cause is involved. What their belief was is always a question for the jury." Stewart v. Sonneborn, 98 U. S. 187, 194, 25 L. Ed. 116.

The plaintiff's evidence makes a prima facie case to the effect that at the time the writs were sued out the plaintiff was solvent; that it was not removing its property from the state, nor had the defend-

ants any just reason for fearing the same; that the writs sued out were premature—that is, before the debts sued for were demandable; that, so far as the writ of attachment for $9,980.80 is concerned, it was causelessly sued out for more by $3,000 than was to become due at the close of the day October 1, 1897; and that the writ for $75,000 was premature even on the theory that the defendants were entitled to recover $75,000 for breach of the contract, and also it was groundless and improperly sued out, because there had been no such impairment of the contract as authorized the defendants to sue for a breach of the same as an entirety, and on the further ground that, even if the contract had been breached, the defendants were insolvent, unable to further comply with the contract themselves, and in fact suffered no damage whatever by the ending of the same. And the plaintiff's evidence tended to show that the defendants acted without due and full inquiry as to the actual facts, not in the best of faith, and with ulterior motives; and, further, that after the facts were shown and ascertained as to prematurity of writs and the just amounts due, the defendants continued and pressed and prosecuted the attachments to the ultimate ruin of the plaintiff's business.

The defendants met this prima facie case by the proposition that the plaintiff corporation, though transacting with defendants and others for years a large business in Florida, with all of its property and a resident agent there, was actually a nonresident of the state; by conflicting evidence as to the breaches of the lumber contract by the plaintiff, and as to the amount actually falling due from the plaintiff under the contract for logs delivered; as to the transactions and negotiations between the parties during the life of the contract leading up to the issuance of the attachments; and as to the ability of the defendants to have carried on their deliveries of logs under the contract to show the damages suffered from the alleged breach. The defendants supplemented their case by showing that prior to the issuance of the attachments they took the advice of their own attorney, learned in the law, who was also secretary and a director in the lumber company, and by the admitted evidence of the defendants Ambler, Meigs, and Liggett to the effect that they acted in good faith, without malice.

The trial judge gave no reasons, preserved in the record, for directing a verdict, and whether he relied upon particular of the grounds assigned in the motion or upon the whole combined we are not advised.

As to the writ of attachment for $9,980.80, the first and third grounds relate to the matter of probable cause, assuming that the plaintiff had failed to prove want of probable cause, and that the case showed the existence of probable cause for suing out the writ. As noticed above, the case shows that this writ was sued out prematurely, and for an amount more than to eventually become due the plaintiff; and in the sum thereof was included a draft for $5,340.75, which was not owned by the lumber company (see May v. Vann, 15 Fla. 554), and there was other evidence tending to show the want of probable cause.

The second ground related to malice, charging that the plaintiff had failed to prove that the writ was sued out maliciously. This has been answered in what was said above; and, besides, malice per se in such actions is a question for the jury. Stewart v. Sonneborn, supra.

The fourth ground charges that it appears from the undisputed evidence that at the time the writ was sued out the defendants believed, and had reasonable grounds for believing, that the plaintiff was indebted to them in the sum of $9,980.80. A sufficient answer to this is that there is no such undisputed evidence.

The fifth ground relates to the matter of malice, asserting that it appears that the Atlantic Lumber Company was advised by counsel learned in the law that they had a right to include in the amount of their attachment the draft of $5,340.75 held by the National Bank of Jacksonville, followed with admission that the writ was prematurely issued; and the sixth ground relates to the same matter, charging that it appears from the undisputed evidence that the defendants acted on the advice of counsel, and were advised that they had a right to sue out said writ of attachment. We understand that the question of advice of counsel in instituting and prosecuting a suit goes to affect the question of malice, which, in suits of this kind, is a question for the jury; but in relation to this particular case we deem it proper to say that the question was one particularly for the jury, because the counsel whose advice was alleged to have been given and taken was a director and secretary of the lumber company, and it is, to a certain extent, the question of a person advising himself in his own interest. We think it reasonably clear that a lawyer "learned in the law" cannot advise himself as to the right and propriety of suing out an attachment, and, when prosecuted for suing it out maliciously, rebut all malice by showing that he advised himself. As to the effect to be given to the advice of interested counsel, see Watt v. Corey and Ricken, 76 Me. 87; Plow & Manufacturing Co. v. Jones & Co., 71 Iowa, 234, 238, 32 N. W. 280.

As to the second writ of attachment the motion presents some dissimilarity in grounds. The first and second are not supported by the evidence.

The third—in regard to the $75,000 attachment—merely claims that it appears from the evidence (not the undisputed evidence) that "the Atlantic Lumber Company had probable cause for suing out the writ of attachment;" and the fourth is that "it appears from the overwhelming weight of the testimony in the case" that the defendants had no malice in suing out the said writ of attachment, but sued the same out in a reasonable and honest belief that they had a cause of action against the plaintiff for which a writ of attachment might issue. Clearly, these questions were matters for the jury.

The fifth ground deals again with what is called "overwhelming weight of the evidence" to the effect that the plaintiff owed the lumber company on account of logs delivered prior to that time; that the failure to pay the amount due for the logs was a breach of a substantial provision of the log contract; that it appears from the undisputed evidence that the defendants entertained an honest and

reasonable belief that the provisions of the log contract called for an average of 3½ logs per 1,000, applied to logs delivered for the whole period of eight years, as shown by their consistent claim to that effect during a period of 3½ years; that it is shown by the undisputed evidence that the officers of the Atlantic Lumber Company entertained a reasonable and honest belief with regard to the general average, and that the court which heard the motion to dissolve the attachment dissolved the same solely on the ground that the logs delivered prior to October 1, 1897, was on that day 3.52 to the 1,000, instead of 3.50. All these relate to questions as to whether and how the parties had complied with the log contract, as to which there is no reconciling the conflicting evidence. It is contended that this court decided that the failure to pay the amount due for logs was a breach of a substantial provision of the log contract, but omission is made of the fact that this court also decided that the provisions of the log contract calling for an average of 3½ logs per 1,000 applied to logs delivered for each and every month of the contract, and not to logs delivered during the whole period of eight years.

The sixth ground of the motion relates to the advice of counsel, asserting that it appears from the evidence that prior to October 1, 1897, Arthur Meigs, general manager of the company, submitted all the material facts of which he had knowledge, or which he could obtain by diligent inquiry, to a licensed and reputable attorney at law, and was advised that under conditions similar the lumber company had the right to sue out attachment for $75,000, etc. What we have hereinbefore remarked as to advice of counsel as proven in this case continues to apply.

The seventh and last ground of the motion claims that the defendants acted under an honest and reasonable belief that the Bucki Lumber Company was indebted to the Atlantic Lumber Company in the sum of $75,000, and that the said Atlantic Lumber Company had the right to proceed to recover said indebtedness by a writ of attachment against the property of the said Bucki & Son Lumber Company. It may be that they did act under an honest and reasonable belief; but whether they did or not, under the evidence of this case, it could only be determined by a jury.

The writ of attachment for $75,000 was prematurely issued, even on the theory that there had been such a breach of the contract as entitled the Atlantic Lumber Company to consider the same abrogated, and claim as damages contingent and prospective profits. In this connection the question is urged as to whether the Atlantic Lumber Company had any right under Florida law to sue out a writ of attachment for unliquidated damages made up of prospective and contingent profits, and arising out of the breach of the contract. The affidavit for the attachment asserts that $75,000 was actually due, and the declaration propounds a claim for no specific liquidated damages, but for $200,000 unliquidated damages. We do not find that the question has been decided by the Supreme Court of the state of Florida in construing the attachment laws of that state, but we do find that the attachment laws provide for a creditor and a debtor and an amount actually due. We have been furnished with very able

briefs on both sides of the proposition, but it would not be profitable to review the arguments advanced nor the cases cited. In Drake on Attachments (6th Ed.) the cases are reviewed, and this conclusion reached:

"23. In the cases above cited, where the damages were unliquidated, it will be observed that the contracts for breach of which suits were brought afforded a rule in themselves for ascertaining the damages, and upon this ground the actions were sustained. But where such is not the case, it has been considered that attachment cannot be resorted to, as will appear in the next three sections."

Paragraph 13 of the log contract stipulates reciprocally $75,000 as liquidated damages for the breach of the contract. As to the effect of such stipulation, see Sun Printing, etc., Association v. Moore, 183 U. S. 642, 646, et seq., 22 Sup. Ct. 240, 46 L. Ed. 366. Whatever effect this stipulation should have in determining the right of the Atlantic Lumber Company to a writ of attachment for $75,000 liquidated damages, based on a breach of the log contract—a question we pass over as not necessarily presented on this record—it certainly furnishes no sufficient ground for holding that there was probable cause shown by the evidence in this case for suing out the attachment for $75,000.

It seems clear that no one of the grounds on the motion to direct a verdict by itself, nor all combined, warranted the court in its action, and therefore, and for the reasons hereinbefore given, we conclude that the court erred in directing a verdict for the defendants.

Although the conclusion reached renders it necessary to reverse the case, there are assignments of error presenting rulings on the trial, which, in view of the new trial to be awarded, ought to be passed upon. We will deal with them seriatim.

The first assignment complains of the ruling of the court denying the plaintiff leave to file an additional count averring the wrongful and malicious prosecution of a common-law suit for $200,000 damages, the filing of which was sought on the ground that it would eliminate from the trial of the action embarrassment which might otherwise arise upon the contention of the defendants that the damages suffered and complained of were not solely upon the wrongful suing out of the attachments. The matter of allowing amendments to pleadings is one within the discretion of the trial court, unless some statute intervenes. No statute is cited, and we see no reason to hold that the trial judge abused his discretion. See Vol. 1, Ency. Pl. & Pr. 524 et seq., for authorities.

The second assignment of error is to a ruling and order of the court requiring plaintiff to produce certain of its books kept in New York and certain other books specified in the exception in advance of the trial. Section 724 of the Revised Statutes [U. S. Comp. St. 1901, p. 583] provides for such orders in cases and under circumstances where parties might be compelled to produce the same by ordinary rules of proceeding in chancery. The grounds of the motion to produce in this instance were that the defendants expected to obtain from said books evidence tending to show that the plaintiff was on October 1, 1897, insolvent, and not realizing any profit out of its

business; and it was alleged that said books contained statements which would show that the plaintiff was, on October 1, 1897, actually unable to meet its accrued obligations. The reasons given for producing the books appear to us to be insufficient, for neither the defendants' insolvency nor inability to actually meet its accrued obligations constituted any defense in the present suit. Kauffman v. Armstrong (Tex.) 11 S. W. 1048; Floyd v. Hamilton, 33 Ala. 235; Lockhart v. Woods, 38 Ala. 631. As to the right to discovery in equity, see Story, Eq. Pl. § 572.

The third assignment of error is to the disallowance of plaintiff's peremptory challenge to a juryman after the court had allowed two of plaintiff's challenges and the plaintiff had tendered the panel, reserving the right to exercise its third peremptory challenge after the defendant should have accepted the panel or challenged one of the members thereof. If there was any error in the court's ruling in this respect, it is not likely to occur in a second trial.

The fourth, fifth, sixth, and seventh assignments relate to the admission of and the refusal to admit certain evidence of doubtful relevancy, tending rather to complicate the case than prejudice either one of the parties.

The eighth and ninth assignments of error complain of the court overruling objections to evidence tending to show what disposition was made of the attached property after release and bonding of the same. In our opinion, these objections should have been sustained, as the evidence appears to be wholly irrelevant, and not tending in any wise to show probable cause or absence of malice in suing out the attachments.

The tenth assignment of error complains of ruling out plaintiff's question to his own witness in regard to the item, "Services of an architect in the cost of the mill." In reality it was the refusal of the court to permit the witness to explain. When another trial shall be had in the case, the witness can give his evidence in such a way that there will be no necessity for an explanation.

The eleventh assignment of error complains of disallowing the plaintiff's objection to the defendants' question to witness McGuire as to how much he had paid for plaintiff's mill when he bought it in 1901, some four years after the attachment was sued out. The irrelevancy of the matter is patent.

The twelfth assignment objects to the ruling of the court overruling the objection to the question propounded by the defendants to one Mr. Simmons, a person not shown to be nor claiming to be an expert, as follows: "Supposing there had been no attachment on October 1, 1897, and the L. Bucki & Son Lumber Company had been unable for any reason to procure this loan, what would have been its ability to continue to make payment of its obligations, including the amount due for logs, and to continue to receive pay for logs?" The objection was on the ground that the question is based on a hypothesis not shown to be true or untrue. It calls for the conclusion of the witness as to the ultimate fact which the jury are impaneled to try without calling for any fact from the witness as to the property and assets of the L. Bucki & Son Lumber Company,

or as to its liability. The objection should have been sustained. 12 Amer. & Eng. Enc. Law, 424, note; Milwaukee Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256.

The thirteenth, fourteenth, and fifteenth assignments of error complain of admitting evidence over the objection of the plaintiff of matters occurring after October 1, 1897, the date of the attachment to establish probable cause or show the absence of malice. "In a suit for malicious prosecution the conduct of the defendants is to be weighed in view of what appeared to them when the suit was instituted, not in the light of subsequently appearing facts." Stewart v. Sonneborn, supra. The evidence appears to be not only irrelevant, but should have been excluded, as tending to unnecessarily complicate an otherwise very complicated case, and because the effect of it would be to mislead the jury.

The sixteenth and seventeenth assignments of error complain that one of the defendants (Ambler) was permitted to testify with regard to his own knowledge and on information as to the affairs of the L. Bucki & Son Lumber Company in the three and four months immediately preceding the issuance of the attachments. The main issue in the case was as to Ambler's good faith—whether, acting conscientiously, impartially, reasonably, and without prejudice, he believed that some of the grounds for suing out the writs of attachment existed. It would seem that the objection to the admission of the evidence sought from Ambler was one rather to its effect than to its admissibility.

The eighteenth assignment of error is based on the fact that the trial judge, over the objection of plaintiff, allowed the defendants Ambler, Meigs, and Liggett to testify that they were not actuated with malice. In Hinds v. Keith, 6 C. C. A. 231, 234, 57 Fed. 10, 13, this court held:

"The courts in many of the states have held that in cases in which knowledge, motive, or intent may be imputed to parties by circumstantial evidence they are permitted to testify directly as to the existence of such motive or intent, and the ruling of the court below was in harmony with these decisions. But we think the sounder principle and better rule is to exclude such evidence. The Supreme Court of Alabama has declared that the rule is well settled in that state that a 'party certifying for himself should not be permitted to state the motive or intention with which he did an act; that such motive or intention is an inferential fact, to be drawn by the jury from proven attendant facts and circumstances.' Burke v. State, 71 Ala. 382; Whizenant v. State, Id. 383. In actions at law in the courts of the United States the rules of evidence and the law of evidence generally of the state within which such courts are held prevail. Rev. St. § 721 [U. S. Comp. St. 1901, p. 581]; Connecticut Mut. Life Ins. Co. v. Union Trust Co., 112 U. S. 250, 5 Sup. Ct. 119 [28 L. Ed. 708]; Ex parte Fisk, 113 U. S. 720, 5 Sup. Ct. 724 [28 L. Ed. 1117]."

In Germania Fire Ins. Co. v. Stone, 21 Fla. 555, the Supreme Court of Florida held as follows:

"Under the statute permitting a party to a civil action to testify in his own behalf, it is competent for him, where the question is whether or not he did a certain act with a fraudulent intent, to testify as to his intention, and to state whether or not he, at the time of acting, considered that he had the right to do the act. Such testimony, however, is not conclusive upon the jury."

—And in argument cited decisions in the state of New York, from which state the Florida statute permitting parties to testify is said to have been obtained, quoting with approval the following proposition from Thurston v. Cornell, 38 N. Y. 281, to wit:

"That under the law admitting parties to testify in their own behalf it is well settled that, where the character of the transaction depends upon the intent of the party, it is competent, when that party is a witness, to inquire of him what his intention was."

If this decision is in harmony with the prevailing jurisprudence in the state of Florida—and we have no reason to doubt it—the trial court may well have admitted the evidence under authority of our decision in Hinds v. Keith, supra. And the same may be said of the questions raised in the nineteenth, twentieth, and twenty-first assignments.

The twenty-second, twenty-third, and twenty-fourth assignments relate to the rejection of evidence claimed to be in rebuttal, and the questions raised may be avoided on another trial.

The twenty-fifth assignment of error complains of the ruling of the court in rejecting evidence as to certain instructions given by the court to the jury in the common-law action of the Atlantic Lumber Company against the L. Bucki & Son Lumber Company to recover alleged indebtedness for which the attachments mentioned in the declaration herein were sued out; the instructions being the then opinion of the court as to certain facts proved in that case. These instructions were ruled out as irrelevant and immaterial to the issues in the present case, and therein we see no error.

The twenty-sixth assignment complains of the instruction of the court directing a verdict in favor of the defendants. This matter has been hereinbefore fully disposed of.

The twenty-seventh assignment complains of the rejection in evidence of a certain bill in equity by plaintiff against the Atlantic Lumber Company to correct the error of the court in calculating the amount of a remittitur ordered in said case on a motion for a new trial. This evidence was rejected by the court as irrelevant and immaterial to the issues in this case. We consider that the evidence offered was too remote to properly affect any of the questions to be presented to the jury. The judgment of the Circuit Court is reversed, and the cause is remanded, with instructions to grant a new trial, and thereafter proceed according to law and in accordance with the views expressed in this opinion.